| | |
|---|---|
| ASSOCIATION OF INDEPENDENT SCHOOLS OF GREATER WASHINGTON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civil Action No. 16-1778 (JEB) |

## MEMORANDUM OPINION

The Fourth Amendment's requirement of individualized suspicion stands as a bulwark against impermissible intrusions upon our citizens' persons, places, and effects. In a "closely guarded category" of contexts, however, Chandler v. Miller, 520 U.S. 305, 309 (1997), the government may be permitted to circumvent this constraint where its needs outweigh individuals' privacy interests. Here, the Court must determine whether private nursery-school teachers in the District of Columbia fall within the narrow band of those who can be subjected to a random, suspicionless search regime.

In 2004, the District passed the Child and Youth Safety and Health Omnibus Amendment Act and established a series of drug- and alcohol-testing policies for individuals who work with children, including employees of private childcare facilities. Nearly a decade later, in 2013, the office responsible for licensing such facilities announced that it was interpreting the Act so as to require the random, suspicionless testing of their personnel. Under these new rules, nursery schools were required to subject their staff to such testing or face the loss of their licenses.

Plaintiffs in this case – the Association of Independent Schools of Greater Washington, the River School, and two individual teachers – are now challenging that testing policy. They set forth two counts in their Complaint, alleging that the testing requirement violates both the Fourth Amendment and the D.C. Administrative Procedure Act. They additionally contend that the District is bound in this case by the doctrine of collateral estoppel, as an earlier administrative determination prevented the revocation of a nursery school's license for its refusal to impose such testing. The District now moves to dismiss, and Plaintiffs have responded with their own Cross-Motion for Summary Judgment. Finding that the District's random testing runs afoul of the Fourth Amendment, the Court will grant Plaintiffs' Motion.

## I.    Background

Because both sides have filed dispositive motions, the facts cannot be set forth in the light most favorable to the non-moving party. Fortunately here the facts that matter are essentially all undisputed.

### A.    Factual History

The context for this case begins over a decade ago, when the city passed the Child and Youth Safety and Health Omnibus Amendment Act of 2004 (CYSHA). The Act was implemented, in part, to address the "tragic effects of drug or alcohol permeating youth group homes" and to prevent "catastrophic consequences" that could result from employees "being under the influence of drugs or alcohol." Council of the District of Columbia, Committee on Human Services, Report on Bill 15-607 (Nov. 12, 2004). To that end, the Act introduced random drug and alcohol testing for those employees in "safety-sensitive positions." Id. CYSHA defines such childcare positions as those in which: (a) the employee has direct contact with children or youth; (b) she is entrusted with the direct care and custody of children or youth;

and (c) the performance of her duties in the normal course of employment may affect the health, welfare, or safety of children or youth. See D.C. Code § 7-2031. For these employees, the Act provides for a regime of suspicionless, random urine testing to be "performed by an outside contractor" at a District-certified laboratory. Id., § 1-620.34(a). The statute also requires "private entit[ies] licensed by the District government [with] employees who work in safety-sensitive positions [to] establish mandatory drug and alcohol testing policies and procedures that are consistent with the" Act. Id., § 1-620.36.

The relevant entities in this case – *viz.*, child-development facilities – are licensed by the Office of the State Superintendent of Education (OSSE). Under the Child Development Facilities Regulation Act, OSSE has the authority to license those facilities that are "a center, home, or other structure that provides care and other services, supervision, and guidance for children, infants, and toddlers on a regular basis." Id., § 7-2031(3). Infants are defined as those younger than 12 months, while toddlers are children between 12 and 24 months of age. Id., § 7-2031(4),(8). The Act, however, explicitly does not address "public or private elementary or secondary school[s] engaged in legally required educational and related functions or a pre-kindergarten education program licensed pursuant to the Pre-K Act of 2008." Id., § 7-2031(3). OSSE's licensing authority thus applies only to those facilities serving infants, toddlers, and children that are not public or private pre-K, elementary, or secondary programs.

Nearly a decade after the passage of CYSHA, OSSE first addressed the intersection of the Act and its licensing authority. In April 2013, the Office issued a memorandum to licensed childcare providers requiring them to conduct random drug and alcohol testing of their employees. According to the memo, "[A]ny personnel who work . . . in a childcare development facility" were considered "safety sensitive" and thus would be "required to participate in a drug

and alcohol testing program that tests applicants before they begin work and employees periodically and randomly." Exh. B (OSSE Memo) at 1. This was followed by subsequent memoranda that provided dates of training sessions regarding compliance and addressed FAQs on the policy, the latter of which stated that "drug/alcohol testing should be conducted during the pre-employment process, randomly, and whenever there is a reasonable suspicion that someone might be using drugs or alcohol." Exh. D (OSSE FAQs).

In issuing these policies, OSSE introduced a testing regime for child-development facilities distinct from that applicable to DCPS and D.C. charter-school employees. Under the governing regulations for those individuals, which are promulgated by the District's Department of Human Resources, employees who "[c]oordinate, develop, or support recreational activities," "[m]anage, plan, direct, or coordinate educational activities, "[p]erform tasks involving individual or group counseling," or "[a]ssess, monitor, or support childcare activities" are considered "protection sensitive," rather than "safety sensitive." 6-B DCMR § 411.2. This means that District public- and charter-school teachers are not subject to random, suspicionless testing. Id., §§ 430.1, 411.

In January 2014, an OSSE employee forwarded an email titled "License Renewal Drug Testing" to Tracy R. Armstrong, the Director of Human Resources at the River School. The School, where individual plaintiffs Katherine Brebbia and Lauren Walence are both employed, is located in Washington, D.C., and educates children from eighteen months to third grade. See Compl., ¶¶ 8, 10-11. The OSSE email informed River that it would be required to implement random drug testing "aligned with CYSHA requirements." ECF No. 2-11 (OSSE Email, Jan. 14. 2014). According to the Office, that meant that (1) the School must conduct pre-employment testing through an outside vendor; (2) the School must determine the percentage of employees to

be tested; (3) the School must submit a list of all employees to an outside vendor for the random selection of employees to be tested; (4) each quarter, the outside vendor must send a list of those employees to be randomly tested to the School; and (5) the School must notify current employees in writing of the testing procedure before it is implemented. Id. at 2.

From April 2014 through June 2015, River objected to the random drug-testing requirements announced by OSSE. In November 2014, it sent a letter to OSSE detailing its refusal to adopt a random, suspicionless testing policy. See May Chiang Decl., Exh. G (Nov. 2014 Letter to OSSE); Nancy Mellon Decl., Exh. 5, ¶¶ 24-25. On June 19, 2015, the D.C. State Superintendent of Education Hanseul Kang provided the School with "an official explanation . . . regarding drug testing by private institutions and lay[ing] out the requirements for full licensing." Chiang Decl., Exh. H (June 2015 Kang Letter). This letter clearly stated that child- development facilities must establish pre-employment and random drug testing for all employees, and that enforcement of the testing provisions was "a requirement for licensure" of such facilities. Id.

In June 2015, the Association of Independent Schools of Greater Washington (AISGW) responded to Superintendent Kang with a letter requesting immediate relief from the random-testing requirement for three of its member schools, including the River School. See ECF No. 2-15 (June 2015 AISGW Letter). In August 2015, Kang sent back a letter making clear that the AISGW schools would be required to implement the policy. Although she acknowledged that OSSE has previously "made certain allowances and granted licenses in a manner inconsistent with the law[,]. . . [t]his approach is not endorsed by OSSE's current leadership," and it was the "policy of the District of Columbia that private, licensed child care providers must engage in drug and alcohol testing for employees." ECF No. 2-16 (Aug. 2015 OSSE Letter). Recognizing, however, that it would "take time for certain facilities to comply with the requirements," Kang

agreed to extend River's license while it developed "policies and procedures necessary to comply with the legal provisions around drug and alcohol testing." Id.

Five months later, on January 11, 2016, the River School received a Notice of Intent to Revoke its child-development-center license. See ECF No. 2-17 (Notice of Revocation). According to the notice, the School's license would be revoked by February 24, 2016, for failure to "establish mandatory drug and alcohol testing policies and procedures that are consistent with the requirements of District law for safety-sensitive employees." Id. at 2. Faced with this penalty, the School "adopted a drug and alcohol testing policy that included random testing," as did the other eight AISGW member schools that hold OSSE licenses as child-development facilities. See Compl., ¶¶ 35, 7.

B.    Procedural History

On September 6, 2016, Plaintiffs filed the instant suit. Their Complaint alleges that requiring child-development facilities such as the River School to implement a random drug- and alcohol-testing policy is a violation of (1) the Fourth Amendment and (2) the District of Columbia's Administrative Procedure Act. See Compl., ¶¶ 52-56. The following month, Defendants requested a 90-day stay of proceedings pending legislative review by the D.C. Council. See ECF No. 12. Plaintiffs agreed to the stay and to withdraw their motion for a preliminary injunction based on the condition that OSSE would not enforce the random-testing requirement during the course of litigation. See ECF No. 20 (Joint Stipulation and Request for Briefing Schedule). In total, Defendants successfully requested three additional stays of proceedings. See Minute Orders of Jan. 25, 2017, Apr. 25, 2017, July 24, 2017.

In December 2016, while this case was stayed, OSSE published rules implementing CYSHA – including regulations addressing mandatory drug and alcohol testing for licensed

child-development facilities. <u>See</u> 5-A DCMR § 136. These regulations require testing of employees prior to employment, upon reasonable suspicion, and post-accident, but do not address random, suspicionless testing. <u>Id.</u>, § 136.3. OSSE, nonetheless, continues to require such testing pursuant to its authority to interpret and implement CYSHA.

Over a year after this case was first filed, Defendants notified Plaintiffs that there had been no legislative development regarding CYSHA. On December 1, 2017, Defendants thus filed their Motion to Dismiss. <u>See</u> ECF No. 22. On January 15, 2018, Plaintiffs filed their Opposition and a Cross-Motion for Summary Judgment. <u>See</u> ECF No. 23-24. These are now ripe.

## II.    Standard of Review

Defendants bring their Motion to Dismiss pursuant to both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), alleging that this Court lacks subject-matter jurisdiction over Plaintiffs' DCAPA claim and that their Fourth Amendment count fails to state a claim upon which relief can be granted. Because the Court does not address the DCAPA claims, it sets out only the 12(b)(6) standard below.

### A.    Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a suit when the complaint "fail[s] to state a claim upon which relief can be granted." In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). A court need not accept as true, however, "a legal conclusion couched as a factual allegation," or an inference

unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation marks omitted).

      B.     Motion for Summary Judgment

In addition to opposing Defendants' Motion to Dismiss, Plaintiffs bring their own Cross-Motion for Summary Judgment.  Summary judgment may only be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.

Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

## III.  Analysis

Before turning to the merits of Plaintiffs' Fourth Amendment claim, the Court looks briefly at the threshold question of standing.  The District asserts that "[b]oth AISGW and The River School lack standing to assert a claim under the Fourth Amendment."  MTD at 34. According to Defendants, "Courts have routinely concluded that Fourth Amendment rights are personal rights," and thus AISGW and River "improperly seek to assert a Fourth Amendment claim on behalf of" the employees of child-development facilities.  Id. at 35.  Asserting that these Plaintiffs lack third-party standing, the District argues that they should be dismissed as parties. Id. at 36.

Plaintiffs reply that both AISGW and the River School do in fact have standing to challenge government-mandated drug testing on behalf of their members and employees.  See MSJ at 33-35.  More importantly, however, Plaintiffs correctly note that the Court need not wade deeply into the waters of Article III, as Defendants do not dispute that the individual Plaintiffs in this case – Brebbia and Walence – have standing to pursue their own Fourth Amendment claims. "To proceed to the merits of [a] claim[]," the Court "need only find one party with standing." Americans for Safe Access v. Drug Enforcement Admin., 706 F.3d 438, 443 (D.C. Cir. 2013). Here, there are two such parties, as both Brebbia and Walence are suffering an injury that is

caused by the testing requirements and can be redressed by the Court.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

As Plaintiffs may proceed with their claims, the Court will separately examine the merits of collateral estoppel and the Fourth Amendment allegations below.  Because Plaintiffs are entitled to summary judgment on their constitutional count, the Court need not go on to analyze their DCAPA claim.

A.    Collateral Estoppel

To begin: should the District even be permitted to defend its suspicionless-testing requirements here or is it barred from doing so under one form of collateral estoppel?  According to Plaintiffs, Defendants are estopped from arguing here that employees of child-development facilities occupy "safety-sensitive" positions that require them to submit to random, suspicionless drug testing.  This line of argument is based off a May 3, 2016, decision by Administrative Law Judge Paul B. Handy in St. Paul's Lutheran Nursery School v. District of Columbia Office of the State Superintendent of Education, which addressed a different challenge to the OSSE drug testing.  See Chiang Decl., Exh. A, Case No. 2015-OSSE-00011 (D.C. Office of Admin. Hearings) (May 3, 2016).  St. Paul's Lutheran Nursery School initiated the action before the D.C. Office of Administrative Hearings (OAH) after receiving OSSE's notice of intent to revoke the school's child-development-facility license for failure to implement the random-testing requirement.  See OAH Order at 2, 6.  AISGW participated in the case by filing an amicus brief in support of St. Paul's and presenting at oral argument.  Id. at 3.

After seven months of proceedings and a two-hour administrative hearing on April 22, 2016, ALJ Handy issued a Final Order prohibiting OSSE from revoking St. Paul's license for failure to implement suspicionless drug and alcohol testing.  The Order concluded that, "in order

to avoid an unconstitutional result," "the CYSHA . . . must be construed in such a manner that teachers and others who come into contact with children are not considered 'safety-sensitive' employees subject to random drug and alcohol testing." Id. at 9.  Three weeks later, OSSE filed a motion with OAH seeking reconsideration of the Final Order, which was subsequently denied on July 28, 2016.  See MTD, Exh. L (OAH Order Denying Reconsideration).  OSSE then had thirty days to petition for judicial review of that determination in the D.C. Court of Appeals, see D.C. App. R. 15(a)(2), but the Office did not appeal.  Plaintiffs argue that, in light of the final OAH Order addressing the constitutional implications of the random, suspicionless testing of child-development-facility employees, Defendants are now estopped from enforcing such a requirement against AISGW schools.

In asserting such a bar, Plaintiffs ask this Court to apply the doctrine of non-mutual offensive collateral estoppel, which may be used where "a plaintiff seeks to estop a defendant from relitigating issues [that] the defendant previously litigated and lost against another plaintiff."  Ali Baba Co. v. WILCO, Inc., 482 A.2d 418, 421-22 (D.C. 1984) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329 (1979)).  To invoke this oddly titled doctrine, the parties in the instant action need not be those in the prior suit – i.e., "mutuality is not required."  K.H., Sr. v. R.H., 935 A.2d 328, 333-34 (D.C. 2007).  Instead, it is the issue that must remain the same, and that issue "must have been raised and litigated, and actually adjuged."  Id. (citation omitted).

Here, Defendants argue both that the St. Paul's decision does not fulfill the basic prerequisites for non-mutual collateral estoppel and that the discretionary factors counsel against applying the doctrine in this case.  They additionally assert that, in order to invoke the doctrine against the District, Plaintiffs must demonstrate "affirmative misconduct by a government

agency." Def. Reply at 5.  As AISGW, unsurprisingly, dissents, the Court looks at each

contention in turn.

1.  *Issue Previously Litigated*

Plaintiffs' central point is that the issue that was raised, litigated, and actually adjudged in

St. Paul's was whether "teachers at OSSE licensees are . . . safety-sensitive employees who can

be subjected to random suspicionless drug and alcohol testing under CYSHA."  MSJ at 18.  The

ALJ's decision in the negative, according to AISGW, was "rendered after full adversary

proceedings" that provided the parties with "a full and fair opportunity to litigate" and thus

should be considered "binding on OSSE here."  Id. at 17-18.

The Court begins with the identity of the issues.  It is clear that the issue raised and

litigated before ALJ Handy is the same as that before this Court – namely, the constitutional

implications of allowing child-development-facility teachers to be deemed "safety-sensitive" and

thus subject to random drug and alcohol testing.  The "dispositive" question articulated in St.

Paul's was whether OSSE could, pursuant to CYSHA, require "random drug and alcohol testing"

of "teachers and others who come into contact with children."  OAH Order at 89.  The issue

before the Court today is precisely that.  Given the breadth of the issue identified as conclusive in

the OAH Order, moreover, the age difference between the children enrolled at St. Paul's and

those at AISGW schools does not matter much in distinguishing between the two cases.  The

issue before OAH was not limited to the specific ages of the children at St. Paul's.  Rather, that

school was seeking re-instatement of its OSSE license – a license that is identical to those held

by AISGW schools and that does not distinguish between facilities based on the precise ages of

the children they serve.  See Pl. Reply at 4.  ALJ Handy's determination relied in no part upon a

reduced need to protect children a year or two older, nor did it suggest that his analysis might

differ for younger age groups. The age difference between the respective schools' student populations therefore does not preclude the application of collateral estoppel.

The question of whether OSSE-licensed child-development-facility teachers could be subject to random drug tests was, moreover, "actually litigated," as it was "contested by the parties and submitted for determination by the court." McLaughlin v. Bradlee, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (citation omitted). Because the District chose not to appeal, moreover, the OAH decision was the final judgment on this issue. See K.H., Sr., 935 A.2d at 334–35 (applying offensive collateral estoppel when party did not appeal and thus prior judgment stood "as final with respect to that party"). Such a final administrative determination can clearly bind OSSE, as "[t]he proposition that administrative proceedings may collaterally estop relitigation in courts is . . . well established." Nasem v. Brown, 595 F.2d 801, 806 (D.C. Cir. 1979). "If the traditional elements of the doctrine are met" and the "agency is acting in a judicial capacity and resolves disputed issues . . . properly before it which the parties have had an adequate opportunity to litigate," an administrative decision can be given collateral-estoppel effect. Id. (citation omitted). Here, the OAH was clearly acting in a "judicial capacity," Oubre v. D.C. Dep't of Employment Servs., 630 A.2d 699, 703 (D.C. 1993); see Final Order at 2-3 (discussing rounds of briefing and motions practice before Administrative Judge), and the Final Order therefore "meets the criteria for application of collateral estoppel principles." Oubre, 630 A.2d at 703.

2. *Factors*

Defendants argue that even if this Court could give collateral-estoppel effect to the OAH decision, it should nonetheless decline to apply the doctrine here. In particular, the District notes that estoppel is disfavored when the first action was for a trivial amount and the second is for a

larger sum, Ali Baba, 482 A.2d at 423, and asserts that the differences in requested relief between the OAH hearing and this case should counsel against finding a preclusive resemblance. Yet while St. Paul's was a challenge to a specific licensing determination, the relief sought here is analogous to that case – namely, that AISGW schools be permitted to retain their licenses without requiring random, suspicionless drug and alcohol testing. It does not seem, therefore, that the distinction in remedies creates a meaningful gulf between the two cases.

In terms of factors favoring estoppel, Plaintiffs argue that the District had "every incentive to litigate the St. Paul's proceeding fully," particularly given that it could have foreseen additional litigation. See Pl. Reply at 5 (internal quotation marks and citation omitted). As AISGW notes, it joined St. Paul's School as an amicus (over the District's objections), and when Defendants filed a motion to reconsider the OAH decision, the River School specifically inquired as to whether it would be subject to any final administrative decision. Id. Yet even knowing that other OSSE-licensed schools also opposed the testing requirement, the District nonetheless declined to appeal. The Court therefore agrees with Plaintiffs that Defendants were on notice as to likely future challenges to the testing policy and thus cannot now claim they were unfairly surprised by the advent of this case.

### 3. *Affirmative Misconduct*

The Court additionally rejects Defendants' argument that AISGW must show affirmative governmental misconduct in order to justify the use of offensive non-mutual collateral estoppel. Citing to Leekley v. District of Columbia Dep't of Emp't Servs., 726 A. 2d 678 (D.C. 1999), the District argues that for a Plaintiff to apply collateral estoppel against the government, "a party must generally make a showing of affirmative misconduct by a government agent." Def. Reply at 5. Yet, as Defendants' parenthetical correctly notes, Leekley addressed the applicability of the

"doctrine of equitable estoppel" – not non-mutual collateral estoppel – against the government. Id. (citing Leekley, 726 A.2d at 680). Indeed, D.C. courts have never held that a showing of affirmative misconduct is a prerequisite to applying offensive non-mutual collateral estoppel against a government actor. See D.C. Office of Tax & Revenue v. Exxonmobil Oil Corp., 141 A.3d 1088, 1091 (D.C. 2016) (discussing application of offensive non-mutual collateral estoppel against the government without mention of affirmative-misconduct requirement); Gould, 852 A.2d at 57 (same); see also Stormont-Vail Regional Medical Center v. Bowen, 645 F. Supp. 1182 (D.D.C. 1986) (same).

*       *       *

All of this notwithstanding, Defendants are correct that there is a high bar when it comes to applying collateral estoppel against the government. Indeed, "[e]stoppels against the public are little favored, and they generally cannot be asserted against, and are not applicable to, the government or governmental entities." D.C. Office of Tax & Revenue, 141 A.3d at 1092 (citation omitted). As the court cautioned in D.C. Office of Tax & Revenue, estoppel against a public actor "should not be invoked except in rare and unusual, or exceptional, circumstances, and may not be invoked where [it] would operate to defeat the effective operation of a policy adopted to protect the public." Id. (citation omitted). In sum, estoppel should "be applied with circumspection, restraint, reluctance, and caution" and invoked "only in those special cases where the interests of justice . . . clearly require it." Id. Here, although the St. Paul's decision meets the basic thresholds for applying collateral estoppel, it is unclear whether Plaintiffs can demonstrate "exceptional" circumstances supporting its use against the District. Id. Given that they prevail on their constitutional claim, the Court need not resolve the estoppel question and moves instead to the Fourth Amendment.

B.        Fourth Amendment

Turning to the Fourth Amendment count, the Court next considers whether Plaintiffs are entitled to judgment as a matter of law on this constitutional claim.  As Defendants do not dispute, the District's random, suspicionless testing constitutes a "search" and thus implicates the Fourth Amendment, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  This is so even when, as here, the "search" is conducted by a private employer at the government's behest.  See Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 614–15 (1989); Bluestein v. Skinner, 908 F.2d 451, 455 (9th Cir. 1990) ("[d]rug testing performed by private employers under compulsion of government regulations constitutes governmental action subject to constitutional restrictions").

As this Court recently noted, random, suspicionless drug tests are "inherently suspect." Lewis v. Gov't of D.C., 282 F. Supp. 3d 169, 184 (D.D.C. 2017) (citing Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ., 158 F.3d 361, 373 (6th Cir. 1998)).  When such searches "serve[ ] special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine" whether they are reasonable.  See Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989); Lewis, 282 F. Supp. 3d at 184 (court must balance government need for search against individuals' privacy interests).  That analysis requires courts to "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler, 520 U.S. at 314.  Here, as both sides agree that the policy falls outside the "normal need for law enforcement," the Court must assess the private and government interests at stake and then determine the balance.

1.    *Individual Interests*

Evaluating the individual interests at stake in a "special needs" search takes into account two factors: (1) the nature of the privacy interest allegedly compromised and (2) the character of the intrusion imposed.  See Board of Educ. of Independent School District No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 830-34 (2002).  The Court discusses each in turn.

a.    Nature of Privacy Interest

The Court starts from the premise that employees subject to government-mandated drug-testing regimes generally have a robust interest in their personal privacy.  See Lewis, 282 F. Supp. 3d at 184.  The question, therefore, is whether there is any reason to conclude that such interest is lessened in the specific context of this case.  The District lobs a series of volleys in favor of such a finding.

First, Defendants assert that these privacy interests for such teachers are reduced because the facilities are heavily regulated to ensure child safety.  See Def. Reply at 8-9.  The Supreme Court has held that, in certain contexts, the pervasive regulation of a field may result in a diminished expectation of privacy for those operating under such constraints.  In Skinner, for instance, it found that the privacy expectations of railroad workers were reduced "by reason of their participation in an industry that is regulated pervasively to ensure safety."  489 U.S. at 627. The inspection of railroad personnel, the Court found, "ha[s] long been a principal focus of regulatory concern," a factor that counseled against finding a robust expectation of privacy.  Id. at 628.

Here, Defendants argue that the regulation of child-development facilities should similarly be found to reduce the teachers' expectation of privacy.  As the District notes, such facilities must maintain certain classroom ratios and sizes, satisfy healthy and safety standards,

and ensure that their staff meet specified professional-development and training requirements. The employees are additionally subject to background checks, fingerprinting, medical examinations, and drug testing prior to employment and must show that they are physically capable of caring for children. See MTD at 13-15. Such regulations, Defendants contend, result in a diminished privacy interest. Plaintiffs rejoin that the regulations governing child-development facilities are a far cry from those previously found to reduce privacy interests in the Fourth Amendment context. AISGW argues that these regulations are analogous to those imposed on D.C. public-school teachers and are "standard for educators," and that Defendants cannot show that they "constitute heavy regulation in the same manner as that faced by railway employees." Pl. Reply at 7-8 (internal quotation marks and footnote omitted) (citing D.C. regulations for public-school teachers at 6-B DCMR §§ 400, 402, 411.1).

On this point, Plaintiffs have the better position. Although "heavy regulation" may counsel in favor of finding a reduced privacy interest in sectors involving "the operation of heavy machinery or means of mass transit," Am. Fed'n of State, Cty. & Mun. Employees Council 79 v. Scott, 717 F.3d 851, 867 (11th Cir. 2013), Defendants fail to show that this premise extends to the supervision of educators or childcare providers. Cf. Patchogue–Medford Congress of Teachers v. Bd. of Educ., 119 A.D. 2d 35, 38-39, (N.Y. App. Div. 1986), aff'd, 70 N.Y. 2d 57 (1987) (finding that teachers are not pervasively regulated). Given the ubiquity of regulation across industries, the Court is mindful that government oversight, in and of itself, cannot per se diminish employees' Fourth Amendment protection. To hold otherwise risks "permit[ting] what has always been a narrow exception to swallow the rule." City of Los Angeles v. Patel, 135 S. Ct. 2443, 2455 (2015).

The requirement that child-development-facility employees are subject to background checks does not alter this analysis. There is no suggestion that such inquiries are equivalent to those previously found to reduce privacy interests, such as "routine personal searches when [U.S. Mint employees] leave work every day" or "intrusive inquiries into . . . physical fitness for [military or intelligence] positions." Vilsack, 681 F. 3d at 492 (quoting Von Raab, 489 U.S. at 671). Indeed, this Circuit has been clear that such "operational realities" are "not characteristic of . . . employment," and that the ordinary realities of government work will only "rarely affect an employee's expectations of privacy in the workplace with respect to searches of his person." Id. at 492-93 (internal citation omitted). The precedent does not support putting nursery-school teachers into this rarified bracket on the basis of their professional environment. See Scott, 717 F.3d at 867 (noting that Court has upheld suspicionless drug testing for limited set of highly regulated "job categories" such as "those directly involved in drug interdiction[,] . . . those who carried firearms[,] and . . . those who handled classified material").

Nor do Defendants succeed with their argument that the teachers' privacy interests here are significantly diminished because they are subject to pre-employment drug testing. See Pl. Reply at 7-8. As Plaintiffs made explicit during oral argument on the Motions, they are not contesting the District's imposition of pre-employment testing. They instead are challenging only the random, suspicionless testing of their schools' incumbent teachers. Such testing, courts have repeatedly held, presents a unique risk to personal privacy. "Unlike pre-employment testing, the individuals who will be tested are not applicants for jobs, but are employees, whose privacy interests are greater than applicants." Transportation Inst. v. U.S. Coast Guard, 727 F. Supp. 648, 655–56 (D.D.C. 1989). In arguing that the pre-employment testing policy "function[s] to minimize caregivers' privacy interests," Def. Reply at 10, the District ignores that

"random testing is more intrusive on the individual's privacy interest than with any other category of testing." <u>Transportation Inst</u>., 727 F. Supp. at 656.

The random nature of the current OSSE search regime also distinguishes the privacy interest at stake in this case from <u>Jones v. McKenzie</u>, 833 F.2d 335 (D.C. Cir. 1987), <u>cert. granted, judgment vacated on other grounds sub nom</u>. <u>Jenkins v. Jones</u>, 490 U.S. 1001 (1989), <u>amended sub nom.</u> <u>Jones v. Jenkins</u>, 878 F.2d 1476 (D.C. Cir. 1989), upon which Defendants rely. In <u>Jones</u>, this Circuit concluded that the D.C. school system's suspicionless drug testing of its transportation-branch employees as part of a "routine, reasonably required[,]" and "employment-related medical examination" did not violate the Fourth Amendment. <u>Id.</u> at 341, 339. The Court went on, however, to "make clear the narrow focus of [its] inquiry" – namely, that it was <u>not</u> addressing whether the school could "require drug testing absent individualized suspicion" outside of the context of a medical examination. <u>Id.</u> at 339. As the opinion explicitly stated, the court in <u>Jones</u> was not resolving "what level of suspicion might be required for random or individualized testing." <u>Id.</u>

So, too, when it comes to the Sixth Circuit's decision in <u>Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.</u>, 158 F.3d 361 (6th Cir. 1998), upholding the suspicionless drug and alcohol testing of school teachers. Unlike in this case, the testing policy at issue in <u>Knox Cty.</u> affected only those individuals who "appl[ied] for, transfer[ed] to, or [were] promoted" to teaching positions. <u>Id.</u> at 363. The tests, therefore, were not random searches of incumbent employees. Again, this distinction between limited, anticipated drug testing and random urinalysis matters when it comes to evaluating Plaintiffs' expectations of privacy. As this Circuit has held, "Random drug testing represents a greater threat to an employee's privacy interest than does mandatory testing because of the unsettling show of authority that may be associated with

unexpected intrusions on privacy." Nat'l Treasury Emps. Union v. U.S. Customs Serv., 27 F.3d

623, 629 (D.C. Cir. 1994) (internal quotation marks omitted); see Vilsack, 681 F.3d at 486

(finding as relevant that "random drug testing policy applie[d] not only to applicants for certain

positions or promotions, but also to incumbent employees"); cf. Von Raab, 489 U.S. at 672 n.2

(noting that testing procedures at issue "minimize the program's intrusion on privacy interests"

in part because "[o]nly employees who have been tentatively accepted for promotion or transfer

to . . . covered positions are tested . . . [and] [e]mployees are notified in advance of the scheduled

sample collection").

The District contends that the testing in this case is less "unsettling" because "receipt of

CYSHA's random testing requirement," which AISGW schools provide to their employees,

results in a diminished expectation of privacy. See MTD at 16. Such notice of the testing,

Defendants assert, rebuts the concern that suspicionless search regimes impose an impermissible

"show of authority." Id. This line of argument holds little water, as a constitutionally infirm

search regime cannot be rehabilitated via notice. See Doe ex rel. Doe v. Little Rock Sch. Dist.,

380 F.3d 349, 354 (8th Cir. 2004) (stating that the government "may not deprive its citizens of

privacy expectations protected by the Fourth Amendment simply by announcing that the

expectations will no longer be honored"). The fact that educators received a copy of the testing

requirements does "not render minimal the overall intrusion" on their privacy. See MTD at 16.

Although the overall regulation of child-development facilities and the requirement that

employees be subject to background checks may slightly diminish caregivers' privacy interest,

the Court finds that such providers nonetheless retain a robust expectation of personal privacy.

See Vilsack, 681 F.3d at 494 (noting that expectation of privacy may be diminished "somewhat"

by background checks but nonetheless "remain[ed] more robust" than in cases allowing for

random, suspicionless testing).  At bottom, the operational realities of nursery schools are not of the type to vitiate the protections of the Fourth Amendment against suspicionless intrusion.

        b.  Intrusion Imposed

The Court looks next to the <u>nature</u> of the intrusion imposed by the OSSE policy.  Neither side devotes significant time to this issue, and this Court will keep its analysis correspondingly brief.  It will, however, note its skepticism regarding Defendants' position that the random drug and alcohol testing is "noninvasive," as it does not "require observation or a physically invasive procedure," is done by a third-party contractor, and is kept confidential.  <u>See</u> MTD at 17 (quoting <u>Vilsack</u>, 681 F.3d at 501).  The Supreme Court has held that government-ordered "collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable."  <u>Skinner</u>, 489 U.S. at 614-17 ("There are few activities in our society more personal or private than the passing of urine.  Most people describe it by euphemisms if they talk about it at all.  It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.") (citation omitted).  Although it has also suggested that the intrusion of urinalysis may be less acute with respect to certain classes of individuals or circumstances, the Court has never held that such testing does not implicate privacy concerns.  <u>See</u> <u>Vernonia</u>, 515 U.S. at 658 (finding that urine testing of schoolchildren with minimal observation presents reduced intrusion on privacy interests).  The methods of testing at issue in this case may not be on the extreme end of the intrusion scale, but the Court concludes that they nonetheless do interfere with Plaintiffs' reasonable expectation of privacy.

2. *Government Interests*

In assessing the government's need for a given suspicionless search regime, courts are instructed to examine (1) the nature and immediacy of the government concerns and (2) the efficacy of a random-testing requirement. This Circuit has made clear that a generalized compelling government interest, without more, does not suffice to justify random, suspicionless searches. That is, "even where the government asserts important interests, it must still demonstrate an immediate threat to those interests that could not practically be addressed through a suspicion-based approach in order to justify" a suspicionless policy. See Vilsack, 681 F.3d at 490. The question here, therefore, is whether the District has shown such an immediate and practicable need for their current testing regime.

a. Nature of Government Concern

As a preliminary matter, neither Plaintiffs nor this Court doubts that the asserted government interest in infant and toddler safety is one of great importance. See Pl. Reply at 10. Indeed, this Court certainly appreciates the District's efforts to protect young children from potential harm. Yet, as discussed above, a compelling interest is not – standing alone – sufficient to impose a random, suspicionless search regime. The inquiry must be into not only the sincerity of the concern, but also its "immediacy or gravity." Transportation Inst., 727 F. Supp. 2d at 657.

Plaintiffs assert that Defendants have not demonstrated such urgency or specificity with respect to their alleged safety interest. AISGW's argument on this point is premised in large part upon the District's failure to present evidence that any child at any licensed child-development facility has been harmed or even endangered because of drug or alcohol use. See Pl. Reply at 10. In response, the District states that "[d]ecreased awareness and poor judgment at a child development facility could prove fatal to child safety." MTD at 21 (emphasis added). Yet, in

support of this position, Defendants can muster only nationwide statistics and nebulous assertions of risk.  See MTD at 20, 27.  Unable to show <u>evidence</u> of substance abuse among childcare providers, the District simply states that "[i]t is well-documented that drug use has increased in the United States" and that "[u]ndoubtedly, drug use may lead to decreased awareness and poor judgment."  MTD at 20.  Such generalized statements do not a concrete government interest make.  The Court does not dispute – nor could anyone – the premise that drug use may cause impairment, but it finds thoroughly unconvincing the relevance of such a broad, commonsense proposition to the facts of this case.

Faced with a dearth of actual evidence, Defendants fall back on the position that they need not make any such showing.  According to the District, "[A] particularized or pervasive drug problem" is not required for the government to be "allow[ed] . . . to conduct suspicionless drug testing."  MTD at 25.  Indeed, Defendants are correct that the Supreme Court has stated that "[a] demonstrated problem of drug abuse" is "not in all cases necessary to the validity of a testing regime."  <u>Chandler</u>, 520 U.S. at 319.  Yet the cases finding an immediate interest in random drug testing have also made clear that the government must provide <u>some </u>basis for its assertions of risk.  As this Circuit noted in <u>Vilsack</u>, "The Supreme Court has found[,] . . . <u>in view of documented problems</u>," a variety of safety concerns to justify suspicionless searches.  See 681 F.3d at 490 (citing <u>Skinner</u>, 489 U.S. at 620-21; <u>Von Raab</u>, 489 U.S. at 670-71) (emphasis added).  Indeed, in <u>Vilsack</u> the court found compelling the "absence of a documented problem" when rejecting the "conclusion that there is so serious a staff drug problem . . . as to present 'special needs' requiring suspicionless intrusion on all employees' Fourth Amendment rights." 681 F.3d at 497.

In determining whether Defendants sufficiently justify their asserted need, the Court is guided by the precedent with facts most resembling the instant case – Jones, upon which Defendants rely in briefing and at argument.  In determining that the District had demonstrated "serious safety concerns" regarding the use of illicit drugs by its transportation employees, this Circuit held that it was "noteworthy that the safety concern in this case was prompted not only by the nature of [transportation] jobs . . . but also by the strong evidence of a veritable 'drug culture' among Transportation Branch employees." 833 F.2d at 340.  "It would have been patently irresponsible," the court concluded, "for school officials to have ignored this situation." Id.; see Vernonia, 515 U.S. at 661-62 (upholding policy requiring random drug testing of student athletes after demonstrated problem of drug and alcohol use and local "drug culture" reaching "epidemic proportions"); Von Raab, 489 U.S. at 669 (upholding suspicionless search of Customs Service employees and noting that they "are often exposed to this criminal element and to the controlled substances it seeks to smuggle into the country" and citing evidence that "officers have been the targets of bribery by drug smugglers on numerous occasions, and several have been removed from the Service for accepting bribes and for other integrity violations"); Vilsack, 681 F.3d at 491 (discussing Supreme Court's reliance on "specific evidence of drug use" in upholding suspicionless search regime of students participating in extracurricular activities).

Here, Defendants have offered no evidence of any drug use by any nursery-school teachers, let alone shown an indication of any pervasive "drug culture" among those individuals. In light of the language in Jones and the weight of precedent referencing evidence of substance abuse, this Court concludes that the District has not made the requisite showing to "clarify – and to substantiate – the precise hazards" that it claims must be addressed by random drug testing. See Chandler, 520 U.S. at 319; Am. Fed'n of Teachers-West Virginia, AFL-CIO v. Kanawha

Cty. Bd. of Educ., 592 F. Supp. 2d 883, 902 (S.D. W.Va. 2009) (rejecting suspicionless searches of teachers when court was provided "with no evidence that moves the risk of the alleged harm from the realm of speculation into reality").

In addition to pointing to the lack of evidence of any drug or alcohol problem among childcare providers, Plaintiffs also contest the gravity of the governmental need by noting that Defendants made no effort to apply CYSHA's drug-and-alcohol-testing policies to child-development-facility teachers from 2004-13. According to Plaintiffs, this delay in implementation indicates that there was no "immediate threat" motivating the random testing. If the risk to children in these facilities is as compelling and urgent as Defendants maintain, Plaintiffs argue, then why did they not implement testing as soon as the statute was passed? According to Defendants, the answer is that "[t]he timing of OSSE's enforcement of CYSHA's random testing requirement does not negate the need for random testing." MTD at 25. That may be so, but such a substantial delay certainly does not support the District's position that nursery-school teachers pose a grave and immediate threat to the children in their care. As this Circuit held in Vilsack, "[T]he [agency's] long-delayed action . . . belie[s] the conclusion that there is so serious a staff drug problem . . . as to present 'special needs' requiring suspicionless intrusion on all employees." 681 F.3d at 497.

Finally, Plaintiffs note that Defendants declined to appeal the decision in St. Paul's. See Reply at 12. As discussed above, the OAH Final Order in St. Paul's resulted in the reinstatement of that nursery school's license, without random and suspicionless drug and alcohol testing. The fact that the District decided not to appeal that determination, according to AISGW, is yet another indicator that teachers do not pose "an imminent threat to children enrolled at nursery schools licensed by OSSE." Reply at 11. St. Paul's is licensed under the same provisions as the

Plaintiffs' institutions, and it is certainly germane that Defendants declined to appeal the OAH decision allowing that school to care for infants and toddlers without random, suspicionless testing.

In sum, the Court finds that although the desire to protect the District's youngest citizens is certainly a sincere and serious government interest, "[t]he lack of evidence . . . coupled with the speculative nature of the risk" means that Defendants do not demonstrate a level of immediacy or concreteness so as to tip the scale sharply in their favor. See Vilsack, 681 F.3d at 498.

b. Practicability

As to the practicability prong, Plaintiffs assert that Defendants cannot show that "adherence to the requirement of individualized suspicion is impractical." Id. at 496. In evaluating the practicability of a suspicion-based regime, courts have often looked to whether it would be "feasible to subject [employees] or their work-product to the kind of day-to-day scrutiny that would appear necessary in order for their supervisory observation to be effective." Nat'l Fed'n of Fed. Employees v. Cheney, 884 F.2d 603, 611 (D.C. Cir. 1989). Here, AISGW asserts that its teachers are subject to such observation, particularly when the District's regulations require that nursery-school teachers work in close proximity and under supervision. See Pl. Reply at 12. Defendants respond that, although the regulations may require such levels of interaction among colleagues and supervisors, they do not know that such environments are actually in place at AISGW schools. See ECF No. 25-2, ¶ 4.

In doing so, the District attempts to create a disputed issue of fact, alleging that it needs further information in order to assess the opportunities for observation in AISGW-school classrooms. Yet speculation as to the schools' non-compliance with District regulations does not

protect Defendants from summary judgment here.  Indeed, the District appears to <u>rely</u> upon the existence of and compliance with these precise regulations earlier in its briefing, when it argues that nursery-school teachers have a diminished expectation of privacy in part because "child development facilities are heavily regulated," including the requirement "that they maintain specific adult-to-child ratios and group sizes . . . and ensure that [] staff satisfy specified professional development and training requirements on safety."  MTD at 14.  To cast such regulations as, on one hand, sufficient to reduce teachers' expectations of privacy but, on the other, irrelevant to the practicalities of their working conditions seems somewhat disingenuous. The Court notes, moreover, that OSSE has the capacity to verify compliance with its own regulations.  <u>See</u> 5-A DCMR §§ 111.1, 111.5, 111.6.  The District cannot, therefore, now "profess[] ignorance" as to whether AISGW schools follow such restrictions in order to create a genuine issue of material fact.  <u>See</u> <u>Serv. Employees Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC</u>, 312 F.R.D. 678, 683 (D.D.C. 2015).

Similarly unavailing is Defendants' position that "[p]eer-to-peer supervision would be inadequate given that caregivers would be unable to properly observe one another while, at the same time, supervising infants and toddlers."  MTD at 23.  This line of argument is somewhat odd, given that neither side disputes that child-development-facility staff are able to monitor the children in their classroom.  There would seem to be minimal, if any, added burden in observing an adult co-worker if one is able to supervise multiple toddlers.  The Court therefore concludes that it would, in fact, be feasible to subject nursery-school teachers to a level of observation consistent with a suspicion-based search regime.  <u>See</u> <u>Am. Fed'n of Teachers-West Virginia, AFL-CIO</u>, 592 F. Supp. 2d at 904 (finding that teachers "do not hold positions for which observation would not detect the relevant impairment").

* * *

Having assessed the competing privacy interests and government interests at stake, the Court must now determine which way the scale tips. As to the former, it concludes that employees of child-development facilities have a significant expectation of privacy. As to the latter, it finds that the District's interest does not rise to the level of immediacy or concreteness needed to justify the random, suspicionless testing of nursery-school teachers. While it does not doubt that Defendants' policy is a sincere attempt to protect infants and toddlers cared for in the District, the Court's holding reflects the principle that preventing the invasion of personal-privacy rights is "among the highest responsibilities of the federal judiciary." Bangert v. Hodel, 705 F. Supp. 643, 655 (D.D.C. 1989). Charged with this duty, the Court determines that nursery-school teachers such as Plaintiffs cannot be subjected to random, suspicionless searches as a condition of their employment. The Court therefore holds as a matter of law that OSSE's testing requirement "does not fit within the closely guarded category of constitutionally permissible suspicionless searches," and it will thus grant Plaintiffs' Motion. Chandler, 520 U.S. at 309.

## IV. Conclusion

For the reasons set forth above, the Court will deny Defendants' Motion to Dismiss and grant Plaintiffs' Cross-Motion for Summary Judgment. A contemporaneous Order so stating will issue this day.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 26, 2018